## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| MARILYN ABRAHAM and FREDA SMITH, on behalf of themselves and all others similarly situated,<br><br>              Plaintiffs,<br><br>    v.<br><br>DR. REDDY'S LABORATORIES, INC.,<br><br>              Defendant. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiffs Marilyn Abraham and Freda Smith (collectively, "Plaintiffs") bring this action on behalf of themselves and all others similarly situated against Defendant Dr. Reddy's Laboratories, Inc. ("Dr. Reddy's" or "Defendant"). Plaintiffs make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to the allegations specifically pertaining to themselves, which are based on personal knowledge.

### NATURE OF THE ACTION AND FACTS COMMON TO ALL CLAIMS

1.      This is a class action lawsuit regarding Dr. Reddy's' manufacturing of ranitidine-based over-the-counter and prescription medications that contain dangerously high levels of N-nitrosodimethylamine ("NDMA"), a carcinogenic and liver-damaging impurity.

2.      Ranitidine is an over-the-counter and prescription medication that is designed to decrease the amount of acid created by the stomach. Ranitidine is intended to be used for the treatment of heartburn associated with indigestion and sour stomach. However, Dr. Reddy's' manufacturing process has caused its ranitidine medications to contain dangerously high levels of NDMA.

3.      NDMA is a semivolatile organic chemical. According to the U.S. Environmental

Protection Agency, NDMA "is a member of N-ni-trosamines, a family of potent carcinogens."

While NDMA is not currently produced in the United States other than for research purposes, it

was formerly used "in production of liquid rocket fuel," among other uses.  NDMA is listed as a

"priority toxic pollutant" in federal regulations.  *See* 40 CFR § 131.36.  Exposure to NDMA can

cause liver damage and cancer in humans.  NDMA is classified as a probable human carcinogen,

and animal studies have shown that "exposure to NDMA has caused tumors primarily of the

liver, respiratory tract, kidney and blood vessels."

4.     On September 13, 2019, the FDA issued a statement announcing the presence of

NDMA in ranitidine-containing medications.[1]  The FDA's notice states that "NDMA is

classified as a probable human carcinogen (a substance that could cause cancer) based on results

from laboratory tests."  Since then, the FDA's own testing "has found unacceptable levels of

NDMA in samples of ranitidine."[2]

5.     Further, on April 1, 2020, the FDA requested that all ranitidine "manufacturers to

withdraw all prescription and over-the-counter (OTC) ranitidine drugs from the market

immediately."[3]  This decision was made because FDA "determined that the impurity in some

ranitidine products increases over time and when stored at higher than room temperatures may

---

[1] Food & Drug Admin., Statement Alerting Patients and Health Care Professionals of NDMA Found in Samples of Ranitidine (Sept. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-alerting-patients-and-health-care-professionals-ndma-found-samples-ranitidine (last accessed Apr. 21, 2020).

[2] Food & Drug Admin., 10/2/19: UPDATE – FDA Provides Update on Testing of Ranitidine for NDMA Impurities (Oct. 2, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/fda-updates-and-press-announcements-ndma-zantac-ranitidine (last accessed Apr. 21, 2020).

[3] Food & Drug Admin., All Ranitidine Products (Zantac): Press Release – FDA Requests Removal (Apr. 1, 2020), https://www.fda.gov/safety/medical-product-safety-information/all-ranitidine-products-zantac-press-release-fda-requests-removal?utm_campaign=FDA%20MedWatch%20-%20All%20Ranitidine%20Products%20%28Zantac%29&utm_medium=email&utm_source=Eloqua (last accessed Apr. 21, 2020).

result in consumer exposure to unacceptable levels of this impurity."[4]

6.      On October 23, 2019, Dr. Reddy's confirmed it "had initiated a voluntary

nationwide recall on October 1, 2019, (at the retail level for over-the-counter products and at the

consumer level for prescription products) of all of its ranitidine medications sold in US due to

confirmed contamination with N-Nitrosodimethylamine (NDMA) above levels established by

the FDA."[5]  The recall affects all products with an expiration date of September 2019 to March

2022.[6]

### A.      Dr. Reddy's Markets Its Ranitidine Medications As Safe

7.      Dr. Reddy's marketed its ranitidine medications as safe and effective products.

8.      On Dr. Reddy's website, Dr. Reddy's touts that its "focus on quality helps ensure

product safety and efficacy, regardless of the drug form."

9.      Dr. Reddy's also notes it has "uniform standards for all products, regardless of

geography.  These standards involve a "four-step process" that includes adopting a "Quality by

Design (QbD) approach in Manufacturing and clearly identify sources of variability and

minimize them on an ongoing basis," "[i]dentify[ing] and eliminat[ing] defects," and

undertaking a "'risk-based' approach to manufacturing and mitigate risks wherever they are

likely to impact quality."

10.      In short, when consumers purchase or are prescribed ranitidine medications

manufactured by Dr. Reddy's respectively, they expect that the medications will be safe and

---

[4] *Id.*

[5] Food & Drug Admin., Dr. Reddy's Confirms its Voluntary Nationwide Recall of All Ranitidine Products in the U.S. (Oct. 23, 2019), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/dr-reddys-confirms-its-voluntary-nationwide-recall-all-ranitidine-products-us-market (last accessed Apr. 21, 2020).

[6] *Id.*

effective for the purpose for which it is purchased.  They do not expect, and Defendant does not disclose, that the medications contain the harmful impurity NDMA.

**B.      Dr. Reddy's Ranitidine Medications Contain Dangerous Levels Of NDMA**

11.      Contrary to the above assertions, Dr. Reddy's ranitidine medications contain dangerously high levels of NDMA that would not be present if the medications were properly synthesized.  As noted in paragraph 4 and 5, *supra*, the FDA has found unacceptable levels of NDMA in samples of ranitidine.

12.      Further, on April 1, 2020, the FDA requested that all ranitidine "manufacturers to withdraw all prescription and over-the-counter (OTC) ranitidine drugs from the market immediately."[7]  This decision was made because the FDA "determined that the impurity in some ranitidine products increases over time and when stored at higher than room temperatures may result in consumer exposure to unacceptable levels of this impurity."[8]

13.      The Medicines and Healthcare Products Regulatory Agency of the United Kingdom has issued an alert regarding ranitidine medications, noting recalls issued by companies are "a precautionary measure due to possible contamination of the active substance in Zantac, ranitidine, with an impurity called NDMA."[9]  "The MHPRA has asked manufacturers to quarantine all ranitidine products which may contain the active pharmaceutical ingredient that is

---

[7] Food & Drug Admin., All Ranitidine Products (Zantac): Press Release – FDA Requests Removal (Apr. 1, 2020), https://www.fda.gov/safety/medical-product-safety-information/all-ranitidine-products-zantac-press-release-fda-requests-removal?utm_campaign=FDA%20MedWatch%20-%20All%20Ranitidine%20Products%20%28Zantac%29&utm_medium=email&utm_source=Eloqua (last accessed Apr. 21, 2020).

[8] *Id*.

[9] Medicine and Healthcare Regulatory Agency, Zantac – MHRA Drug Alert Issued as GlaxoSmithKline Recalls all Unexpired Stock (Oct. 8, 2019), https://www.gov.uk/government/news/zantac-mhra-drug-alert-issued-as-glaxosmithkline-recalls-all-unexpired-stock (last accessed Apr. 21, 2020).

potentially affected by this issue."[10]

14.     While the cause of the NDMA contamination in ranitidine medications is still being investigated by the FDA and other regulatory agencies, the Health Products Regulatory Authority of Ireland, in issuing a recall of ranitidine medications, has stated: "The reason for the recall is that a nitrosamine impurity has been identified in ranitidine active substance batches manufactured at a manufacturing site in India."[11]

15.     The "FDA has set the acceptable daily intake limit for NDMA at 0.096 micrograms or 0.32 ppm [parts per million] for ranitidine"[12] But Dr. Reddy's' ranitidine medications, according to testing by the FDA, have an NDMA content of 0.68 ppm, more than twice the acceptable daily limit:

| Company | Product | Lots Tested | NDMA level ppm |
|---------|---------|-------------|----------------|
| Dr. Reddy's | Rx Ranitidine 300mg | C805265 | 0.68 |

16.     Further, on April 1, 2020, the FDA requested that all ranitidine "manufacturers to withdraw all prescription and over-the-counter (OTC) ranitidine drugs from the market immediately."[13]  This decision was made because FDA "determined that the impurity in some

---

[10] *Id*.

[11] Health Products Regulatory Authority, Precautionary Pharmacy and Retail Level Recall of Several Batches of a Number of Ranitidine Medicines in Ireland (Sept. 23, 2019), https://www.hpra.ie/homepage/medicines/safety-notices/item?t=/precautionary-pharmacy-and-retail-level-recall-of-several-batches-of-a-number-of-ranitidine-medicines-in-ireland&id=d26b0c26-9782-6eee-9b55-ff00008c97d0 (last accessed Apr. 21, 2020).

[12] Food & Drug Admin., Laboratory Analysis of Ranitidine and Nizatidine Products (Nov. 1, 2019), https://www.fda.gov/drugs/drug-safety-and-availability/laboratory-tests-ranitidine (last accessed Apr. 21, 2020).

[13] Food & Drug Admin., All Ranitidine Products (Zantac): Press Release – FDA Requests Removal (Apr. 1, 2020), https://www.fda.gov/safety/medical-product-safety-information/all-ranitidine-products-zantac-press-release-fda-requests-removal?utm_campaign=FDA%20MedWatch%20-%20All%20Ranitidine%20Products%20%28 Zantac%29&utm_medium=email&utm_source=Eloqua (last accessed Apr. 21, 2020).

ranitidine products increases over time and when stored at higher than room temperatures may result in consumer exposure to unacceptable levels of this impurity."[14]

### C.     Plaintiffs Were Harmed By Purchasing Or Being Prescribed And Consuming Defective Ranitidine Medications Manufactured By Defendant

17.     Plaintiffs and the Class and Subclasses were injured by the full purchase price of their Dr. Reddy's ranitidine medications.  These medications are worthless, as they contain harmful levels of NDMA, which is underscored by Dr. Reddy's' "voluntary nationwide recall…of all of its ranitidine medications sold in US due to confirmed contamination with [NDMA] above levels established by the FDA."[15]  As the medications expose users to NDMA well above the legal limit, the medications are not fit for human consumption.  Plaintiffs are further entitled to statutory damages, damages for the injury sustained in consuming high levels of acutely-toxic NDMA, and for damages related to Defendant's conduct.

18.     Plaintiffs bring this action on behalf of themselves and the Class and Subclasses for equitable relief and to recover damages and restitution for: (i) breach of the implied warranty of merchantability, (ii) violation of the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code §§ 17.41 *et seq.*, (iii) violation of the Kentucky Consumer Protection Act, Ky. Rev. Stat. §§ 367.110 *et seq.*, (iv) unjust enrichment, (v) fraudulent concealment, (vi) fraud, and (vii) conversion.

### PARTIES

19.     Plaintiff Marilyn Abraham is a citizen of Texas who resides in Brownsville,

---

[14] *Id*.

[15] Food & Drug Admin., Dr. Reddy's Confirms its Voluntary Nationwide Recall of All Ranitidine Products in the U.S. (Oct. 23, 2019), https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/dr-reddys-confirms-its-voluntary-nationwide-recall-all-ranitidine-products-us-market (last accessed Apr. 21, 2020).

Texas.  During all relevant time periods, Ms. Abraham was prescribed and consumed ranitidine medications manufactured by Dr. Reddy's.  Ms. Abraham originally learned about the ranitidine defect through news sources reporting NDMA in ranitidine medications.  Each time Ms. Abraham picked up her ranitidine medications, she was required to make a co-payment of $3.40. When purchasing her ranitidine medications manufactured by Defendant, Ms. Abraham reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the manufacturer, distributor, and pharmacy that the ranitidine medication she consumed were properly manufactured and free from carcinogenic contaminants such as NDMA. Ms. Abraham relied on these representations and warranties in deciding to consume her ranitidine medication from Dr. Reddy's, and these representations and warranties were part of the basis of the bargain, in that she would not have consumed her ranitidine medication manufactured by Defendant if she had known that it was not, in fact, properly manufactured, and contained the carcinogenic impurity NDMA.  Ms. Abraham understood that each purchase involved a direct transaction between herself and Dr. Reddy's because her medication came with packaging and other materials prepared by Dr. Reddy's, including representations and warranties that her medication was properly manufactured, free from carcinogenic impurities such as NDMA, and safe for use.

20.     Plaintiff Freda Smith is a citizen of Kentucky who resides in Versailles, Kentucky.  During all relevant time periods, Ms. Smith was prescribed and consumed ranitidine medications manufactured by Dr. Reddy's.  Ms. Smith originally learned about the ranitidine defect through news sources reporting NDMA in ranitidine medications.  When purchasing her ranitidine medications manufactured by Defendant, Ms. Smith reviewed the accompanying labels and disclosures, and understood them as representations and warranties by the

manufacturer, distributor, and pharmacy that the ranitidine medication she consumed were properly manufactured and free from carcinogenic contaminants such as NDMA.  Ms. Smith relied on these representations and warranties in deciding to consume her ranitidine medication from Dr. Reddy's, and these representations and warranties were part of the basis of the bargain, in that she would not have consumed her ranitidine medication manufactured by Defendant if she had known that it was not, in fact, properly manufactured, and contained the carcinogenic impurity NDMA.  Ms. Smith understood that each purchase involved a direct transaction between herself and Dr. Reddy's because her medication came with packaging and other materials prepared by Dr. Reddy's, including representations and warranties that her medication was properly manufactured, free from carcinogenic impurities such as NDMA, and safe for use.

21.     Defendant Dr. Reddy's Laboratories, Inc. is a Delaware corporation with a principal place of business at 107 College Road East, Princeton, New Jersey 08540.  Dr. Reddy's Laboratories, Inc. is a wholly owned subsidiary of Indian corporation Dr. Reddy's Laboratories Ltd.  Dr. Reddy's conducts substantial business in the United States, and has $20 million in annual sales of ranitidine.[16]  Dr. Reddy's does substantial business in the States of Texas and Kentucky.  Dr. Reddy's has been engaged in the manufacturing of defective ranitidine throughout the United States, including in the States of Texas and Kentucky.

## JURISDICTION AND VENUE

22.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100

---

[16] Darshan Mehta, *U.S. FDA Finds Ranitidine Drugs Sold by Strides, Ajanta Pharma Safe to Use*, BLOOMBERG QUINT, Nov. 4, 2019, https://www.bloombergquint.com/business/us-fda-finds-ranitidine-drugs-sold-by-strides-ajanta-pharma-safe-to-use (last accessed Nov. 26, 2019).

members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interest and costs.

23. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is located in this District.

## CLASS ALLEGATIONS

24. Plaintiffs seek to represent a class defined as all persons in the United States who purchased ranitidine-containing medications manufactured by Dr. Reddy's (the "Class"). Specifically excluded from the Class are persons who made such purchase for the purpose of resale, Defendant, Defendant's officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint ventures, or entities controlled by Defendant, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or Defendant's officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

25. Plaintiff Abraham seeks to represent a subclass of all Class members who purchased ranitidine-containing medications manufactured by Dr. Reddy's in Texas (the "Texas Subclass").

26. Plaintiff Smith seeks to represent a subclass of all Class members who purchased ranitidine-containing medications manufactured by Dr. Reddy's in Kentucky (the "Kentucky Subclass") (collectively, the "Subclasses").

27. Subject to additional information obtained through further investigation and discovery, the foregoing definitions of the Class and Subclasses may be expanded or narrowed by amendment or amended complaint.

28. **Numerosity.** The members of the Class and Subclasses are geographically

dispersed throughout the United States and are so numerous that individual joinder is impracticable.  Upon information and belief, Plaintiffs reasonably estimate that there are hundreds of thousands of members in the Class and tens of thousands of members in the respective Subclasses.  Although the precise number of members in the Class and Subclasses is unknown to Plaintiffs, the true number of members in the Class and Subclasses is known by Defendant and may be determined through discovery.  Members of the Class and Subclasses may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

29.     **Existence and predominance of common questions of law and fact.**  Common questions of law and fact exist as to all members of the Class and Subclasses and predominate over any questions affecting only individual members of the Class and Subclasses.  These common legal and factual questions include, but are not limited to, the following:

(a)     whether the ranitidine medications manufactured by Defendant contain dangerously high levels of NDMA, thereby breaching the express and implied warranties made by Defendant and making the ranitidine-containing medications unfit for human consumption and therefore unfit for their intended purpose;

(b)     whether Defendant knew or should have known that the ranitidine-containing medications contained elevated levels of NDMA prior to selling the medications, thereby constituting fraud and/or fraudulent concealment;

(c)     whether Defendant has unlawfully converted money from Plaintiffs and the Class and Subclasses;

(d)     whether Defendant is liable to Plaintiffs and the Class and Subclasses for

unjust enrichment;

(e)     whether Defendant is liable to Plaintiffs and the Class and Subclasses for

fraudulent concealment;

(f)     whether Defendant is liable to Plaintiff Abraham and the Texas Subclass for

violations of Texas consumer-protection laws;

(g)     whether Defendant is liable to Plaintiff Smith and the Kentucky Subclass for

violations of Kentucky consumer-protection laws;

(h)     whether Defendant is liable to Plaintiffs and the Class and Subclasses for

breaches of express and implied warranties;

(i)     whether Plaintiffs and the Class and Subclasses have sustained monetary loss

and the proper measure of that loss;

(j)     whether Plaintiffs and the Class and Subclasses are entitled to declaratory and

injunctive relief;

(k)     whether Plaintiffs and the Class and Subclasses are entitled to restitution and

disgorgement from Defendant; and

(l)     whether the marketing, advertising, packaging, labeling, and other promotional

materials for the ranitidine-containing medications are deceptive.

30.     **Typicality.**  Plaintiffs' claims are typical of the claims of the other members of

the Class and Subclasses in that Defendant mass marketed and sold defective ranitidine-based

medications to consumers throughout the United States.  This defect was present in all of the

ranitidine-containing medications manufactured, distributed, and sold by Defendant.  Therefore,

Defendant breached its express and implied warranties to Plaintiffs and members of the Class

and Subclasses by manufacturing, distributing, and selling the defective ranitidine-containing

medications.  Plaintiffs' claims are typical in that they and members of the Class and Subclasses were uniformly harmed in purchasing and consuming the defective ranitidine-containing medications.  Plaintiffs' claims are further typical in that Defendant deceived Plaintiffs in the very same manner as they deceived each member of the Class and Subclasses.  Further, there are no defenses available to Defendant that are unique to Plaintiffs.

31.     **Adequacy of Representation.**  Plaintiffs will fairly and adequately protect the interests of the Class and Subclasses.  Plaintiffs have retained counsel that is highly experienced in complex consumer class action litigation, and Plaintiffs intend to vigorously prosecute this action on behalf of the Class and Subclasses.  Furthermore, Plaintiffs have no interests that are antagonistic to those of the Class and Subclasses.

32.     **Superiority.**   A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual members of the Class and Subclasses are relatively small compared to the burden and expense of individual litigation of their claims against Defendant.  It would, thus, be virtually impossible for the Class and Subclasses, on an individual basis, to obtain effective redress for the wrongs committed against them.  Furthermore, even if members of the Class and Subclasses could afford such individualized litigation, the court system could not.  Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts.  Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action.  By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances.

33.     In the alternative, the Class and Subclasses may also be certified because:

(a)     the prosecution of separate actions by individual members of the Class and Subclasses would create a risk of inconsistent or varying adjudications with respect to individual members of the Class and Subclasses that would establish incompatible standards of conduct for the Defendant;

(b)     the prosecution of separate actions by individual members of the Class and Subclasses would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other members of the Class and Subclasses not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

(c)     Defendant has acted or refused to act on grounds generally applicable to members of the Class and Subclasses as a whole, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class and Subclasses as a whole.

## COUNT I
### Breach Of The Implied Warranty Of Merchantability
### (On Behalf Of The Class And Subclasses)

34.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

35.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and the Subclasses against Defendant.

36.     Defendant, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the ranitidine medications (i) would not contain elevated levels of NDMA and (ii) are generally recognized as safe for human consumption.

37.     Defendant breached the warranty implied in the contract for the sale of the defective ranitidine medications because they could not pass without objection in the trade under the contract description, the ranitidine medications were not of fair or average quality within the description, and the ranitidine medications were unfit for their intended and ordinary purpose because the ranitidine medications manufactured, distributed, and sold by Defendant were defective in that they contained elevated levels of carcinogenic and liver-toxic NDMA, and as such are not generally recognized as safe for human consumption.  As a result, Plaintiffs and members of the Class and Subclasses did not receive the goods as impliedly warranted by Defendant to be merchantable.

38.     Plaintiffs and members of the Class and Subclasses purchased the ranitidine medications in reliance upon Defendant's skill and judgment and the implied warranties of fitness for the purpose.

39.     The ranitidine medications were not altered by Plaintiffs or members of the Class and Subclasses.

40.     The ranitidine medications were defective when it left the exclusive control of Defendant.

41.     Defendant knew that the ranitidine medications would be purchased and used without additional testing by Plaintiffs and members of the Class and Subclasses.

42.     The ranitidine medications were defectively manufactured and unfit for their intended purpose, and Plaintiffs and members of the Class and Subclasses did not receive the goods as warranted.

43.     As a direct and proximate cause of Defendant's breach of the implied warranty, Plaintiffs and members of the Class and Subclasses have been injured and harmed because: (a)

they would not have purchased the ranitidine medications on the same terms if they knew that the ranitidine medications contained harmful levels of NDMA, and are not generally recognized as safe for human consumption; and (b) the ranitidine medications do not have the characteristics, ingredients, uses, or benefits as promised by Defendant.

44.     As a result of Defendant's breach of implied warranty, Plaintiffs and each of the members of the Class and Subclasses have been damaged in the amount of the purchase price of the ranitidine medications and any consequential damages resulting from the purchases.

**<u>COUNT II</u>**
**Violation Of The Texas Deceptive Trade Practices Act**
**Tex. Bus. & Com. Code §§ 17.41 *et seq.***
**(On Behalf Of The Texas Subclass)**

45.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

46.     Plaintiff Abraham brings this claim individually and on behalf of the members of the proposed Texas Subclass against Defendant.

47.     Plaintiff Abraham, the members of the Texas Subclass, and Defendant are each "persons" as defined by Tex. Bus. & Com. Code § 17.45(3).

48.     Defendant's ranitidine medications are goods under Tex. Bus. & Com. Code § 17.45(1).

49.     Plaintiff Abraham and members of the Texas Subclass are "consumers" as defined in Tex. Bus. & Com. Code § 17.45(4).

50.     Defendant has at all relevant times engaged in "trade" and "commerce" as defined in Tex. Bus. & Com. Code § 17.45(6), by manufacturing, distributing, and selling ranitidine medications in Texas, directly or indirectly affecting Texas citizens through that trade and commerce.

51.     The allegations set forth herein constitute false, misleading, or deceptive trade acts or practices in violation of the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41, *et seq.* ("TDTPA").

52.     By failing to disclose the presence of harmful and carcinogenic NDMA in its ranitidine medications, despite affirmative representations to Plaintiff Abraham and members of the Texas Subclass that the ranitidine medications were safe for human consumptions and did not contain harmful carcinogens such as NDMA, Defendant engaged in deceptive business practices prohibited by the TDTPA, including engaging in acts or practices which are unfair, misleading, false, or deceptive to the consumer.

53.     As alleged above, Defendant made numerous material statements about the benefits and characteristics of the ranitidine medications that were either false or misleading. Each of these statements contributed to the deceptive context of Defendant's unlawful advertising and representations as a whole.

54.     Defendant owed Plaintiff Abraham and other members of the Texas Subclass a duty to disclose the presence of NDMA in its ranitidine medications because Defendant

(a)     Made incomplete representations about the characteristics and performance of the ranitidine medications generally, while purposefully withholding material facts from Plaintiff Abraham and members of the Texas Subclass that contradicted these representations

(b)     Advertised goods with the intent not to sell them as advertised by representing that the ranitidine medications did not contain harmful impurities such as NDMA and were safe for human consumption, when in fact, Defendant knew about the presence of NDMA in its ranitidine medications.  In 2003, it was

"proposed that elevated levels of NDMA in drinking water … may be associated with the drug ranitidine."[17]  Likewise, in 2004, a study found the use of Zantac to be "related to the risk of bladder cancer."[18]  Furthermore, a 2016 study by Stanford University found that individuals who took ranitidine medications had "NDMA levels [in their urine] more than 400 times greater than what the FDA considers acceptable."[19]

55.     To their detriment, Plaintiff Abraham and members of the Texas Subclass relied upon Defendant's material representations, and/or relied on the absence of disclosure by Defendant, that its ranitidine medications (i) did not contain harmful or carcinogenic impurities such as NDMA, and (ii) were safe for human consumption.

56.     Defendant made these material representations to induce Plaintiff Abraham and members of the Texas Subclass to act, i.e. to purchase ranitidine medications manufactured by Defendant.

57.     Defendant's intentional concealment of and failure to disclose to Plaintiff Abraham and members of the Texas Subclass the presence of NDMA in its ranitidine medications, thus rendering the medications unsafe for human consumption, constitutes an "unconscionable action or course of action" under Tex. Bus. & Com. Code § 17.45(5) because,

---

[17] VALISURE, VALISURE CITIZEN PETITION ON RANITIDINE 4-5 (2019), https://www.valisure.com/wp-content/uploads/Valisure-Ranitidine-FDA-Citizen-Petition-v4.12.pdf (last accessed Apr. 21, 2020) (hereinafter "VALISURE PETITION").

[18] Dominque S. Michaud et al., *Peptic Ulcer Disease and the Risk of Bladder Cancer in a Prospective Study of Male Health Professionals*, 13 CANCER EPIDEMIOLOGY, BIOMARKERS & PREVENTION 250, 252 (2004) https://pdfs.semanticscholar.org/3eeb/c399404a2b100d90c6698bd4fc73a748864e.pdf (last accessed Apr. 21, 2020).

[19] Jonathan Lapook, *Potentially Dangerous Chemical Found in Popular Heartburn Pill Zantac*, CBS NEWS, Oct. 8, 2019, https://www.cbsnews.com/news/zantac-ndma-levels-potentially-dangerous-chemical-zantac-ranitidine-heartburn-pills-2019-10-08/ (last accessed Apr. 21, 2020).

to the detriment of Plaintiff Abraham and members of the Texas Subclass, that conduct took advantage of their lack of knowledge, ability, and experience to a grossly unfair degree. That "unconscionable action or course of action" was a producing cause of the economic damages sustained by Plaintiff Abraham and members of the Texas Subclass.

58.     As a result of Defendant's unlawful acts in violation of the TDTPA detailed above, Plaintiff Abraham and members of the Texas Subclass sustained damages and are, therefore, entitled to damages and other relief as provided under the TDTPA.

59.     Plaintiff Abraham and members of the Texas Subclass should be awarded treble damages as punitive damages under the DTPA.  Awarding treble damages in this case is necessary to encourage private enforcement of Texas's consumer protection laws.

60.     Pursuant to § 17.50(d), Plaintiff Abraham and members of the Texas Subclass also requests attorneys' fees, and any other relief the Court deems proper, as permitted by the TDTPA

**COUNT III**
**Violation Of The Kentucky Consumer Protection Act**
**Ky. Rev. Stat. § 367.110 *et seq*.**
**(On Behalf Of The Kentucky Subclass)**

61.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

62.     Plaintiff Smith brings this claim individually and on behalf of the members of the proposed Kentucky Subclass against Defendant.

63.     Plaintiff Smith and Kentucky Subclass members are consumers entitled to the protections of the Kentucky Consumer Protection Act, Ky. Rev. Stat. § 367.110 *et seq*. (the "KCPA").

64.     Defendant deceived Plaintiff Smith and members of the Kentucky Subclass in

violation of the KCPA by promoting and/or allowing sales of its ranitidine medications without disclosing the presence of harmful and carcinogenic NDMA in the medications, thus rendering the medications unsafe for human consumption. Such acts constitute unfair, false, misleading, and deceptive acts or practices in the conduct of trade and/or commerce. Said pattern of conduct was uniform in nature with respect to the marketing and sale of the ranitidine medications.

65.     Defendant knowingly concealed, suppressed, and consciously omitted material facts from Plaintiff Smith and other members of the Kentucky Subclass knowing that consumers would rely on its uniform representations and warranties of safety and quality when purchasing the ranitidine medications. In 2003, it was "proposed that elevated levels of NDMA in drinking water … may be associated with the drug ranitidine."[20] Likewise, in 2004, a study found the use of Zantac to be "related to the risk of bladder cancer."[21] Furthermore, a 2016 study by Stanford University found that individuals who took ranitidine medications had "NDMA levels [in their urine] more than 400 times greater than what the FDA considers acceptable."[22]

66.     Plaintiff Smith and members of the Kentucky Subclass did not become aware of any facts which would have called into question the false public perception of safety which Dr. Reddy's had created, until after the ranitidine medications were recalled.

67.     Defendant knowingly accepted the benefits of its deception and improper conduct in the form of profits from the sales of the ranitidine medications. Specifically, Dr. Reddy's

---

[20] VALISURE PETITION 4-5.

[21] Dominque S. Michaud et al., *Peptic Ulcer Disease and the Risk of Bladder Cancer in a Prospective Study of Male Health Professionals*, 13 CANCER EPIDEMIOLOGY, BIOMARKERS & PREVENTION 250, 252 (2004) https://pdfs.semanticscholar.org/3eeb/c399404a2b100d90c6698bd4fc73a748864e.pdf (last accessed Apr. 21, 2020).

[22] Jonathan Lapook, *Potentially Dangerous Chemical Found in Popular Heartburn Pill Zantac*, CBS NEWS, Oct. 8, 2019, https://www.cbsnews.com/news/zantac-ndma-levels-potentially-dangerous-chemical-zantac-ranitidine-heartburn-pills-2019-10-08/ (last accessed Apr. 21, 2020).

ranitidine medications produce $20 million in annual sales.

68.     As a proximate result of the above-described KCPA violations, Plaintiff Smith and other members of the Kentucky Subclass: (a) purchased and used the ranitidine medications when they would not otherwise have done so; and (b) suffered economic losses consisting of the cost of purchasing the ranitidine medications.

69.     On behalf of herself and other members of the Kentucky Subclass, Plaintiff Smith seeks to recover compensatory and punitive damages as a result of Defendant's conduct, along with reasonable attorneys' fees and costs.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf Of The Class And Subclasses)**

70.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

71.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendant.

72.     Plaintiffs and the Class and Subclasses conferred a benefit on Defendant in the form of monies paid to purchase Defendant's defective ranitidine medications.

73.     Defendant voluntarily accepted and retained this benefit.

74.     Because this benefit was obtained unlawfully, namely by selling and accepting compensation for medications unfit for human use, it would be unjust and inequitable for the Defendant to retain it without paying the value thereof.

**COUNT V**
**Fraudulent Concealment**
**(On Behalf Of The Class and Subclasses)**

75.     Plaintiffs hereby incorporate by reference the allegations contained in all

preceding paragraphs of this complaint.

76.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendant.

77.     Defendant had a duty to disclose material facts to Plaintiffs and the Class and Subclasses given their relationship as contracting parties and intended users of the ranitidine-containing medications, including the ranitidine medications.  Defendant also had a duty to disclose material facts to Plaintiffs and the Class and Subclasses, namely that they were in fact manufacturing, distributing, and selling harmful ranitidine-containing medications, including the ranitidine medications, containing NDMA that were unfit for human consumption.  Such duty to disclose exists because Defendant had superior knowledge that the medications were defective and contained harmful levels of NDMA such that the transactions without the disclosure were rendered inherently unfair.

78.     Defendant possessed knowledge of these material facts.  In 2003, it was "proposed that elevated levels of NDMA in drinking water … may be associated with the drug ranitidine."[23]  Likewise, in 2004, a study found the use of Zantac to be "related to the risk of bladder cancer."[24]  Furthermore, a 2016 study by Stanford University found that individuals who took ranitidine medications had "NDMA levels [in their urine] more than 400 times greater than what the FDA considers acceptable."[25]  During that time, Plaintiffs and members of the Class

---

[23] VALISURE PETITION 4-5.

[24] Dominque S. Michaud et al., *Peptic Ulcer Disease and the Risk of Bladder Cancer in a Prospective Study of Male Health Professionals*, 13 CANCER EPIDEMIOLOGY, BIOMARKERS & PREVENTION 250, 252 (2004) https://pdfs.semanticscholar.org/3eeb/c399404a2b100d90c6698bd4fc73a748864e.pdf (last accessed Apr. 21, 2020).

[25] Jonathan Lapook, *Potentially Dangerous Chemical Found in Popular Heartburn Pill Zantac*, CBS NEWS, Oct. 8, 2019, https://www.cbsnews.com/news/zantac-ndma-levels-potentially-dangerous-chemical-zantac-ranitidine-heartburn-pills-2019-10-08/.

and Subclasses were using the ranitidine medications without knowing it contained dangerous levels of NDMA.

79.     Defendant failed to discharge their duty to disclose these materials facts.

80.     In so failing to disclose these material facts to Plaintiffs and the Class and Subclasses, Defendant intended to hide from Plaintiffs and the Class and Subclasses that they were purchasing and consuming ranitidine medications with harmful defects that were unfit for human use, and thus acted with scienter and/or an intent to defraud.

81.     Plaintiffs and the Class and Subclasses reasonably relied on Defendant's failure to disclose insofar as they would not have purchased the defective ranitidine medications manufactured, distributed, and sold by Defendant had they known the ranitidine medications contained unsafe levels of NDMA.

82.     As a direct and proximate cause of Defendant's fraudulent concealment, Plaintiffs and the Class and Subclasses suffered damages in the amount of monies paid for the defective ranitidine medications.

83.     As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

## COUNT VI
### Fraud
### (On Behalf Of The Class and Subclasses)

84.     Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

85.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendant.

86.     As discussed above, Defendant provided Plaintiffs and members of the Class and

Subclasses with materially false or misleading information about their ranitidine-containing medications, including the ranitidine medications, manufactured by Defendant.  Specifically, Defendant has marketed the ranitidine-containing medications as safe for human consumption.  As indicated above, however, these representations are false and misleading as Defendant's ranitidine-containing medications contained elevated levels of NDMA.

87.     The misrepresentations and omissions of material fact made by Defendant, upon which Plaintiffs and members of the Class and Subclasses reasonably and justifiably relied, were intended to induce and actually induced Plaintiffs and members of the Class and Subclasses to purchase the defective ranitidine medications.

88.     Defendant knew that the ranitidine containing medications were contaminated with this harmful impurity, but continued to manufacture it nonetheless.  In 2003, it was "proposed that elevated levels of NDMA in drinking water … may be associated with the drug ranitidine."[26]  Likewise, in 2004, a study found the use of Zantac to be "related to the risk of bladder cancer."[27]  Furthermore, a 2016 study by Stanford University found that individuals who took ranitidine medications had "NDMA levels [in their urine] more than 400 times greater than what the FDA considers acceptable."[28]  During that time, Plaintiffs and members of the Class and Subclasses were using the medications without knowing that they contained dangerous levels of NDMA.

---

[26] VALISURE PETITION at 4-5.

[27] Dominque S. Michaud et al., *Peptic Ulcer Disease and the Risk of Bladder Cancer in a Prospective Study of Male Health Professionals*, 13 CANCER EPIDEMIOLOGY, BIOMARKERS & PREVENTION 250, 252 (2004) https://pdfs.semanticscholar.org/3eeb/c399404a2b100d90c6698bd4fc73a748864e.pdf (last accessed Apr. 21, 2020).

[28] Jonathan Lapook, *Potentially Dangerous Chemical Found in Popular Heartburn Pill Zantac*, CBS NEWS, Oct. 8, 2019, https://www.cbsnews.com/news/zantac-ndma-levels-potentially-dangerous-chemical-zantac-ranitidine-heartburn-pills-2019-10-08/ (last accessed Apr. 21, 2020).

89.    The fraudulent actions of Defendant caused damage to Plaintiffs and members of the Class and Subclasses, who are entitled to damages and other legal and equitable relief as a result.

90.    As a result of Defendant's willful and malicious conduct, punitive damages are warranted.

## COUNT VII
### Conversion
### (On Behalf Of The Class And Subclasses)

91.    Plaintiffs hereby incorporate by reference the allegations contained in all preceding paragraphs of this complaint.

92.    Plaintiffs bring this claim individually and on behalf of the members of the proposed Class and Subclasses against Defendant.

93.    Plaintiffs and the Class and Subclasses have an ownership right to the monies paid for the defective ranitidine manufactured by Defendant.

94.    Defendant has wrongly asserted dominion over the payments illegally diverted to them for the defective ranitidine medications.  Defendant has done so every time that Plaintiffs and the Class and Subclasses bought the ranitidine-containing medications.

95.    As a direct and proximate cause of Defendant's conversion, Plaintiffs and the Class and Subclasses suffered damages in the amount of the payments made for each time they were prescribed or paid money for the ranitidine medications.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Defendant, as follows:

(a)    For an order certifying the Class and the Subclasses under Rule 23 of the Federal Rules of Civil Procedure and naming Plaintiffs as the representatives of the Class and Subclasses and Plaintiffs' attorneys as Class Counsel;

(b)    For an order declaring the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiffs, the Class, and the Subclasses on all counts asserted herein;

(d)    For compensatory, statutory, and punitive damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiffs and the Class and Subclasses their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated:  April 30, 2020                    Respectfully submitted,

**BURSOR & FISHER, P.A.**

By:    */s/ Andrew J. Obergfell*
         Andrew J. Obergfell

Andrew J. Obergfell
888 Seventh Avenue, Third Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile:  (212) 989-9163
Email: aobergfell@bursor.com

**BURSOR & FISHER, P.A.**
Sarah N. Westcot (*Pro Hac Vice Forthcoming*)
2665 S. Bayshore Drive, Suite 220
Miami, FL 33133

Telephone: (305) 330-5512
Facsimile:  (925) 407-2700
Email: swestcot@bursor.com

*Attorneys for Plaintiffs*